**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

JAMES R. BAILES,

                    Plaintiff,

v.                                                    CIVIL  ACTION  NO.  3:09-0146

ERIE INSURANCE PROPERTY AND
CASUALTY COMPANY,

                    Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment in the instant action (Doc. 19 & Doc. 20).  For the following reasons, the Court **GRANTS** Defendant Erie Insurance Property and Casualty Company's motion (Doc. 19) and **DENIES** Plaintiff James R. Bailes' motion (Doc. 20).

**Background**

Plaintiff James R. Bailes is an attorney and a resident of Huntington, Cabell County, West Virginia.  Together with his brother, Harold Bailes, Plaintiff owns a piece of real property located at 84 Carr Street, Clay, West Virginia ("Carr Street Property").  Defendant Erie Insurance Property and Casualty Company ("Erie") is Plaintiff's long-standing insurer.  Plaintiff holds an Ultracover Home Protector Policy and a Personal Catastrophe Liability Endorsement with Erie, both of which were renewed on December 18, 2008, and thus were in full force and effect at all times relevant to this controversy.  The Carr Street Property, and the question of whether such property is covered under Plaintiff's Ultracover Home Protector Policy or Plaintiff's Personal Catastrophe Liability Endorsement, is the subject of this litigation.

As early as 1994, James and Harold Bailes jointly inherited the Carr Street Property, following their mother's death. After inheriting the property, the brothers made plans to sell and, at some point, listed the property. However, because no offers were made, it remains jointly owned by them. Over the 15-year period that the Bailes brothers have owned the Carr Street Property, it has never been advertised for rent. Still, the property has been rented, on a few occasions, over this period. Most recently, James and Harold Bailes agreed to rent the Carr Street Property to Sherry and Willard Brown, a married couple, who moved to Clay, West Virginia, from New Mexico in December 2008.

Sherry Brown arranged the rental of the Carr Street Property. Mrs. Brown and her husband desired to live close to his family in Clay, West Virginia, and Mrs. Brown discovered the Carr Street Property while scouting the area. At that time, there were no signs or other indications that the Carr Street Property was for rent. Nonetheless, after seeing the property and inquiring about it locally, Mrs. Brown learned the residence was owned, at least in part, by Harold Bailes. Consequently, on December 15, 2009, Mrs. Brown contacted Harold Bailes to ask whether the Carr Street Property might be available to rent. Mrs. Brown did not reach Mr. Bailes directly that day. Instead, she left a message concerning her desire to rent the property. Harold Bailes returned her phone call and, after consultation with his brother James Bailes, informed the Browns that they could rent the Carr Street Property. Neither Harold Bailes nor James Bailes had any dealings with the Browns prior to Sherry Brown contacting Harold Bailes on December 15, 2009.

The terms of the Browns' rental agreement were never reduced to writing. Nonetheless, the parties concur that the Bailes and the Browns agreed to enter into a month-to-month lease, beginning on January 1, 2009, with a rental payment of $400 per month, the first payment of which was due

on January 2, 2009.  After entering into this lease, Mrs. Brown again contacted Harold Bailes, this time to inquire whether she and her husband could stay at the Carr Street Property over the December 2008 holidays.  Without requiring an increased or early payment of rent, Harold Brown agreed.  Accordingly, the Browns moved into the Carr Street Property on or about December 22, 2008.

Unfortunately, the 2008 holiday season took a tragic turn for the Brown Family.  In the late evening of December 25, 2008, or early in the morning hours of December 26, 2008, Mrs. Brown's husband, Willard, died while sleeping at the Carr Street Property, ostensibly from carbon monoxide poisoning.  Additionally, Mrs. Brown suffered injuries allegedly related to carbon monoxide poisoning, as did other members of the Brown Family who were at the Carr Street Property on or about December 25, 2008.

On or about January 5, 2009, Sherry Brown and the other members of the Brown Family purportedly injured on or about December 25, 2008, filed a lawsuit against James and Harold Bailes in the United States District Court for the District of New Mexico.  There, in a complaint styled *Melissa Scott, et al. v. Harold Bailes and James Bailes* ("Underlying Complaint"), the plaintiffs allege that James and Harold Bailes negligently maintained the Carr Street Property and that such negligent maintenance was the direct and proximate cause of (1) Willard Brown's death and (2) other non-fatal injuries suffered by members of the Brown Family.  The instant action stems from the *Melissa Scott* lawsuit.  Specifically, this case addresses whether Erie is obligated, under either the Ultracover Home Protector Policy or the Personal Catastrophe Liability Endorsement issued to James Bailes, to defend or indemnify Mr. Bailes in the New Mexico action.

In response to the *Melissa Scott* complaint, Plaintiff submitted a claim to Erie, requesting

3

coverage under his Ultracover Home Protector Policy.  Erie issued an initial denial letter to Plaintiff

on January 22, 2009, refusing coverage on the grounds that the rental of the Carr Street Property and

the subsequent injuries to the Brown Family fall under the "business pursuits" exceptions contained

in both the Ultracover Home Protector Policy and the Personal Catastrophe Liability Endorsement.

On February 18, 2009, Plaintiff filed this action.  Plaintiff seeks a declaration from the Court that

Erie "is required to defend, to provide benefits, to indemnify, and to otherwise provide insurance

coverage for the Plaintiff from and against all claims arising out of the underlying Complaint styled

*Melissa Scott, et al. v. Harold Bailes and James Bailes*, which is currently pending in a United

States District Court of New Mexico[.]" *Pl.'s Compl.* (Doc. 1-5), 11.

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is

proper if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law." *Fed. R. Civ. P. 56(c)*.  "By its very terms, this standard provides that the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In other words, the

availability of summary judgment turns on whether a proper jury question exists in a pending case.

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970).

In considering a motion for summary judgment, the Court draws any permissible inference

from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The Court will not "weigh the

4

evidence and determine the truth of the matter[.]" *Anderson*, 477 U.S. at 249. Nonethless, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor," *Anderson*, 477 U.S. at 256, and, if the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element, then summary judgment will be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### Analysis

The parties agree that the facts of this case are not in dispute. *See Def.'s Mot. Summ. J.* (Doc. 19), 5-6; *Pl.'s Mem. In Supp. of Pl.'s Mot. Summ. J.* (Doc. 21), 17. This matter is therefore ripe for disposition by summary judgment. *See, e.g., First Fin. Ins. Co. v. Crossroads Lounge, Inc.*, 140 F.Supp.2d 686, 694 (S.D. W. Va. 2001) ("Absent indication to the contrary, West Virginia law [governs] interpretation of [an] insurance policy at issue in [a] declaratory judgment action, where jurisdiction is based on diversity of citizenship."); Syl. Pt. 1, *Tennant v. Smallwood*, 568 S.E.2d 10 (W. Va. 2002) ("Determination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law.").

Plaintiff's arguments for coverage can be segregated according to whether they arise under (1) the Ultracover Home Protector Policy, or (2) the Personal Catastrophe Liability Endorsement. The ultracover policy and the endorsement will therefore be addressed in turn.

### The Ultracover Home Protector Policy

It is undisputed that Plaintiff renewed his long-standing ultracover policy and personal catastrophe endorsement with Erie on December 18, 2008.  Thus, it is undisputed that the policy and the endorsement were in full force and effect at the time of the alleged carbon monoxide poisoning at the Carr Street Property.  Additionally, Erie concedes: (1) that the allegation of carbon monoxide poisoning made in the *Melissa Scott* case would, if proven, constitute "bodily harm" as defined in Plaintiff's policy and in the personal catastrophe endorsement, *Def.'s Resp. to Pl.'s Req. for Admis.* Doc. 19, Ex. B), and (2) the allegation of negligence asserted in the New Mexico case, if found to be an "accident," would be an "occurrence" as defined by the policy and the endorsement.[1]  *Id.*  As a result, it appears, at first glance, that the death of Willard Brown and the injuries sustained by the Brown Family might be covered under Erie's policy.[2]

Upon further review, however, it is evident that the coverage issue is not so simple, because the ultracover policy contains a number of limitations and exclusions.  To begin with, the policy contains a "business pursuits" exclusion, stating that Erie will not cover "[**b**]**odily injury**, **property damage** or **personal injury** arising out of **business pursuits** of **anyone we protect**."[3]  *See Pl.'s*

---

[1]Although not expressly conceded to by Erie, a review of Plaintiff's Ultracover Home Protector Policy also shows that: (1) Plaintiff is a "named insured" under the policy, *Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), and (2) Plaintiff qualifies as "anyone we protect" under the policy.  *Id.* at 4.

[2]*See Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 14 ("[Erie] will pay all sums up to the amount shown on the **Declarations** which **anyone we protect** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period.") (emphasis in original).

[3]"Business" is defined in the policy as "any full-time, part-time or occasional activity engaged in as a trade, profession or occupation, including farming."  *Id.* at 4.  "Business pursuits," however, are not specifically defined.

6

*Ultracover Home Protector Policy* (Doc. 20, Ex. A), 15 (emphasis in original).  Additionally, the policy contains, amongst others, an "expected or intended" exclusion, a "professional services" exclusion, and an "insured location" exclusion.

In its initial denial letter, dated January 22, 2009, Erie denied Plaintiff's claim based on the "business pursuits" exclusion quoted above.  *See Erie's Denial Letter*, January 22, 2009 (Doc. 1-3, Ex. C).  Subsequently, Plaintiff filed this lawsuit, seeking a declaration of coverage based upon (1) the above-mentioned concessions, and (2) his theory that the "business pursuits" exclusion does not apply in the instant case.  Plaintiff contends the "business pursuits" exclusion does not apply because "the events which led to the filing of the underlying Complaint do not arise from any type of business." *Pl.'s Compl.* (Doc. 1-5), ¶ 50.  Plaintiff argues that the December 2008 events "do not arise from any type of business" because "no landlord-tenant relationship existed [] at the time of Mr. Brown's death and Plaintiff cannot be deemed to have been in the rental business at said time." *Id.* at ¶ 51.  Further, Plaintiff argues that the "business pursuits" exclusion is not applicable because, "[e]ven if a landlord-tenant relationship ... did exist ... Plaintiff's trade, profession and/or occupation is as an attorney, not a landlord."  *Id.* at ¶ 52-53.  In the alternative, Plaintiff argues that the rental of the Carr Street Property, at a maximum, constitutes an "occasional" business activity, for which coverage is provided under the Erie policy.[4]  *Id.* at ¶ 54.  On September 15, 2009, Plaintiff filed a motion for summary judgment based on the above claims and theories.

In its response to Plaintiff's motion, Erie argues its denial of Plaintiff's claim was

---

[4]*See Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 15 ("**We** do cover ... occasional **business** activities of **anyone we protect**.  These include, but are not limited to, babysitting, caddying, lawn care, newspaper delivery and other similar activities.") (emphasis in original).

appropriate, and remains so, because: (1) the rental of the Carr Street Property is "a trade, profession or occupation," *see Def.'s Resp. to Pl.'s Mot. Summ. J.* (Doc. 23), 2-4; (2) the rental of the Carr Street Property was not an "occasional" business pursuit, *id*. at 4-6; and (3) the Carr Street Property was not an "insured location" under the policy.[5]  *Id.* at 6-8.  Erie's third argument cites Exclusion #5 in the policy, which provides, in pertinent part, that Erie does not cover "[**b**]**odily injury**, **property damage** or **personal injury** arising out of any premises owned by or rented to **anyone we protect** which is not an **insured location**."  *Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 15 (emphasis in original).

Applying the "insured location" exclusion, Erie contends that, regardless of whether the "business pursuits" exclusion applies, Plaintiff is not entitled to coverage under the ultracover policy.  Plaintiff disagrees.  Accordingly, he argues that the "business pursuits" question must be addressed because (1) the "insured location" exclusion does not bar coverage because the ultracover policy provides insurance to Plaintiff, not merely to his residence premises, and (2) Erie is precluded from raising the "insured location" exclusion at this point in the litigation.  Plaintiff's latter argument – that Erie may not assert the "insured location" exclusion – relies upon the fact that Erie made no reference to the exclusion in its January 22, 2009, denial letter.  Because the exclusion was not raised in the denial letter, Plaintiff contends that Title 114, Series 14-6.5 of the West Virginia Code of State Rules now bars its assertion.  *See W. Va. Code R. § 114-14-6.5.*

Plaintiff misconstrues Erie's "insured location" argument.  Erie does not contend that all

_____

[5]On September 15, 2009, Erie filed its own motion for summary judgment, arguing denial was appropriate based on: (1) the "business pursuits" exclusion, (2) the "insured location"exclusion, and (3) the terms of the personal catastrophe endorsement.  *See generally Def.'s Mot. Summ. J.* (Doc. 19).

coverage under its policy is limited to Plaintiff's residence premises, but rather that coverage for the Carr Street Property is specifically excluded pursuant to the plain terms of Exclusion # 5. Erie therefore argues that Plaintiff is improperly seeking coverage for which it neither contracted, nor paid a premium. Applying the relevant case law, the Court finds this argument convincing.

In West Virginia, "insurance policies are to be strictly construed against the insurer." *Burr v. Nationwide Mut. Ins. Co.*, 359 S.E.2d 626, 630-31 (W. Va. 1987); *see also* Syl. Pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987); *id.* at Syl. Pt. 5. Further, a court is "obliged to give an insurance contract that construction which comports with the reasonable expectations of the insured." *Burr,* 359 S.E.2d at 631. Nonetheless, it is well-settled that insurance contracts should be interpreted according to the plain, ordinary meaning of the language used. Syl. Pt. 2, *Glen Falls Ins. Co. v. Smith*, 617 S.E.2d 760 (W. Va. 2005). Therefore, the doctrine of strict construction generally only applies if and when an insurance policy contains an ambiguous term.[6] *See id.* at Syl. Pt. 4; *Hambric*, 499 S.E.2d 619 at Syl. Pt. 6. Further, "[w]ith respect to insurance contracts, the doctrine of reasonable expectations is that the *objectively* reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored[.]" Syl. Pt. 9, *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W. Va. 1998); *McMahon & Sons*, 356 S.E.2d 488 at Syl. Pt. 8 (emphasis supplied).

In the instant case, the plain language of the "insured location" exclusion contained in Plaintiff's ultracover policy is unambiguous. The provision specifically excludes coverage for

---

[6]"Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." *Glen Falls,* 617 S.E.2d 760 at Syl. Pt. 3; Syl. Pt. 5, *Hambric v. Doe*, 499 S.E.2d 619 (W. Va. 1997).

"**bodily harm**," such as the death of Willard Brown or the alleged carbon monoxide poisoning of the Brown Family, "arising out of any premises owned by or rented to **anyone we protect** that is not an **insured location**."  *Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 15 (emphasis in original).  Further, a review of the policy shows unambiguously that the Carr Street Property is not an "insured location" therein, for, the property is not identified as the "residence premises" on the Declarations, nor does it otherwise qualify.[7]  Accordingly, the applicability of the "insured location" exclusion to coverage for bodily injury arising out of Plaintiff's ownership of the Carr Street Property does not require "painstaking study of the policy provisions," *see Murray*, 509 S.E.2d 1 at Syl. Pt. 9, and the exclusion may therefore be enforced according to the insurance contract's plain, ordinary terms.  *See, e.g., id.*; *id.* at Syl. Pt. 1; *Glen Falls*, 617 S.E.2d 760 at Syl. Pt. 2.  Said differently, the Court **FINDS** that a plain meaning reading of Plaintiff's ultracover policy releases Erie from providing coverage to Plaintiff for the claims asserted in the Underlying Complaint.

In light of this finding, the question presented by the parties' cross-motions is whether Title 114, Series 14-6.5 bars Erie from asserting the "insured location" exclusion.  The West Virginia Supreme Court of Appeals' decision in *Potesta v. U.S. Fid. & Guar. Co.,* 504 S.E.2d 135 (W. Va.

---

[7]In the policy, an "insured location" is defined as "1. the **residence premises**; 2. the part of any other premises, other structures, and grounds acquired by **you** during the policy period which **you** intend to use as a **residence premises**; 3. any premises used by **anyone we protect** in connection with premises included in 1. or 2.; 4. any part of a non-owned premises: a. where **anyone we protect** is temporarily residing; or b. occasionally rented to **anyone we protect** for non-**business** purposes; 5. vacant land, other than farmland, owned by or rented to **anyone we protect**; 6. land owned by or rented to **anyone we protect** on which a one or two family residence is being built for occupancy by **anyone we protect**; 7. cemetery plots or burial vaults of **anyone we protect**.  *Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 5 (emphasis in original).

1998), informs this determination.

Title 114, Series14-6.5 of the West Virginia Code of State Rules provides, "No insurer may deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to such provision, condition or exclusion is included in the denial.  The denial must be given to the claimant in writing or as otherwise provided in subsection 6.6. of these rules."  *W. Va. Code R. § 114-14-6.5.*  Plaintiff is correct in that the State Insurance Commissioner was authorized to promulgate this rule.  *See W. Va. Code* § 33-2-10 ("The commissioner is authorized to promulgate and adopt rules relating to insurance as are necessary to discharge his or her duties and exercise his or her powers and to effectuate the provisions of this chapter, protect and safeguard the interests of policyholders and the public of this state.").  Therefore, Plaintiff properly contends that this rule is a "legislative rule,"entitled to the full force and effect of the law.  *W. Va. Code* § 29A-1-2(d); *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 466 S.E.2d 424, 434 (W. Va. 1995).  Nonetheless, the Court finds Plaintiff's argument regarding the effect of Title 114, Series 14-6.5 in the instant action unconvincing.

To begin with, the plain language of Title 114, Series 14-6.5 does not require that an insurance company forfeit an exclusion, or any other reason for denying coverage, simply because such exclusion was not included in the company's initial denial letter.  To the contrary, the provision makes no mention of forfeiture and contains no time element.  As a result, this Court **FINDS** that a plain meaning reading of the rule merely requires that an insurance company provide a specific explanation to its insured in the case of a denial of coverage.  Said differently, the rule simply requires an insurer to specifically inform an insured why coverage is being denied.  Read this way, the rule provides an insured with sufficient information to contest a denial of coverage; meanwhile,

comporting with the purposes of West Virginia Code § 33-11-4, the Unfair Trade Practices Article of the State's Insurance Chapter and the law which Title 114, Series 14-6.5 seeks to clarify.[8]

Additionally, this interpretation of Title 114, Series 14-6.5 is consistent with the West Virginia Supreme Court of Appeals' reasoning and holding in *Potesta*.  *See generally* 504 S.E.2d 135.  In *Potesta*, the Supreme Court of Appeals answered two certified questions, posed to the court by the United States Court of Appeals for the Fourth Circuit.  As rephrased by the Supreme Court of Appeals, the two questions were:

1.  "Must an insured have detrimentally relied upon an insurer's previously stated reason for denying coverage in order to assert waiver or estoppel to prevent an insurer, in subsequent litigation, from asserting other, previously unarticulated reasons for denying coverage?"; and

2.  "Are the principles of waiver and estoppel inoperable to extend insurance coverage beyond the terms of an insurance contract except where either the insurer expressly relinquishes its right to deny coverage or the insured detrimentally relies upon the insurer's unconditional defense of an action brought against the insured?"

The relevant facts here are similar to the facts in *Potesta*, where the aforementioned questions arose when an insurance company sought to deny coverage based on an exclusion that, although it prevents coverage, was not raised when the insurer originally denied its insured's claim. *See generally id.*  Specifically, in *Potesta*, the insurer initially denied coverage based upon an exclusion regarding property damage to "property [the insured] own[ed], rent[ed] or occup[ied], *id.* at 138-39, and later, in subsequent litigation, relied upon an exclusion concerning "negligent work."

---

[8] Subsection 9 of the West Virginia Code § 33-11-4 is the "Unfair claim settlement practices" section of the Unfair Trade Practices Article of the State's Insurance Chapter, *see W. Va. Code § 33-11-4(9)*, and Title 114, Series 14-6 is the "Unfair Trade Practices" Series of the "Insurance Commissioner" Title of the Code of State Rules; the Series which provides the "Standards For Prompt Investigations And Fair And Equitable Settlements To All Insurers." *See generally W. Va. Code R. § 114-14-6.*

*Id.* at 139.  The *Potesta* facts further mirror the facts relevant herein because the parties filed motions for summary judgment, asking the Court to determine the applicability of the "negligent work" exclusion.

The *Potesta* summary judgment motions were referred to a United States Magistrate Judge, who determined "that the West Virginia Supreme Court of Appeals would most likely rely upon the case of *McLaughlin v. Connecticut Gen. Life Ins. Co.*, 565 F.Supp. 434, 451-52 (N.D. Cal. 1983), in deciding the case[.] ... Accordingly, the magistrate adopted the "*McLaughlin* rule," which states that where an insurer relies upon specific grounds for denying a claim, the insurer is thereafter deemed, with respect to subsequent litigation, to have waived any and all additional reasons, apparent from a reasonable investigation, that it may have asserted in support of its earlier denial." *Id.* at 139-40.

However, upon review of the Magistrate Judge's decision, the West Virginia Supreme Court of Appeals did not adopt the *McLaughlin* rule.  Instead, the court held:

1.   "In the law of insurance the elements of an estoppel against an insurer are conduct or acts on the part of the insurer which are sufficient to justify a reasonable belief on the part of the insured that the insurer will not insist on a compliance with the provisions of the policy and that the insured in reliance upon such conduct or acts has changed his position to his detriment[,]" *id.* at Syl. Pt. 2;

2.   "There is no requirement that an insured have detrimentally relied upon an insurer's previously stated reason(s) for denying coverage in order to assert *waiver* to prevent the insurer, in subsequent litigation, from asserting other, previously unarticulated reasons for denying coverage.  Rather, the insured must show, by clear and convincing evidence, where waiver is implied, that the insurer intentionally and knowingly waived the previously unarticulated reason(s) for denying coverage[,]" *id.* at Syl. Pt. 3 (emphasis in original); and

3.   "Generally, the principles of waiver and estoppel are inoperable to extend insurance coverage beyond the terms of an insurance contract."  *Id.* at Syl. Pt. 5.

Although not discussed in any detail in the course of the *Potesta* decision, the Supreme Court

13

of Appeals addressed Title 114, Series 14-6.  Specifically, the court noted that the insured cited Title 114, Series 14-6 as support for its argument for a "'presumed prejudice/conditional waiver' rule: where an insurer states a specific reason for denying coverage, the law would presume that the insured has relied on this stated reason to his/her detriment, and the stated reason would thereafter operate as a 'conditional waiver' of all unarticulated reasons for declination that were not initially asserted by the insurer."  *Id.* at 141, n. 10.  The *Potesta* court did not adopt the "presumed prejudice/conditional waiver" rule.  Instead, the Court held that "[t]he doctrine of waiver focuses on the conduct of the party against whom waiver is sought, and requires that party to have intentionally relinquished a known right," *id.* at 142-43, finding that such "resolution ... adequately addresses [the insured's] concerns as they are reflected by the [] cited authorities," *id.* at 141, which included Title 114, Series 14-6.

In the instant case, Plaintiff's argument is essentially that, pursuant to Title 114, Series 14-6.5, Erie waived its right to, or is estopped from, raising the "insured location" exclusion contained in its ultracover policy because it did not raise such exclusion prior to this litigation.  Viewed in light of *Potesta*, however, and considered in light of this Court's interpretation of Title 114, Series 14-6.5, *infra*, Plaintiff's argument is clearly erroneous.  First, Plaintiff has not provided clear and convincing evidence that Erie knowingly and intentionally waived its right to rely on the "insured location" exclusion.  *Id.* at Syl. Pt. 3.  Second, Erie is not estopped from raising such exclusion because Plaintiff fails to show that he detrimentally relied upon Erie's initial denial letter.  *Id.* at Syl. Pt. 2. Finally, and most importantly, "the principles of waiver and estoppel are inoperable to extend insurance coverage beyond the terms of an insurance contract."  *Id.* at 147.

Plaintiff entered into an ultracover policy that contained an "insured location" exclusion,

14

which specifically excludes coverage for "[**b**]**odily injury**, **property damage** or **personal injury** arising out of any premises owned by or rented to **anyone we protect** which is not an **insured location**." *Pl.'s Ultracover Home Protector Policy* (Doc. 20, Ex. A), 15 (emphasis in original). The term "insured location" was explicitly defined in the policy and it does not include the Carr Street Property. *See id.* at 5 (defining the "insured location" as the policyholder's "residence premises," property acquired to be used as a residence premises, vacant land owned by someone protected under the policy, cemetery plots or burial vaults of someone protected under the policy, land upon which a residence is being built for someone protected under the policy, or any non-owned property where someone protected under the policy is temporarily residing or occasionally uses for non-business purposes). Thus, a plain language reading of Plaintiff's ultracover policy shows that the contract does not provide coverage for the claims asserted against Plaintiff in the Underlying Complaint. Therefore, because Title 114, Series 14-6 does not preclude Defendant from raising the "insured location" exclusion at this juncture, the Court **GRANTS** summary judgment to Defendant with regard to this claim.[9]

### The Personal Catastrophe Liability Endorsement

Erie's liability, or lack thereof, under Plaintiff's Personal Catastrophe Liability Endorsement is more straightforward. The endorsement is a separate contract entered into by the parties. Thus, like the underlying policy, the endorsement is interpreted in conformity with West Virginia insurance law. *See, e.g., First Fin. Ins. Co.*, 140 F.Supp.2d at 694; *Tennant*, 568 S.E.2d 10 at Syl. Pt. 1. As a result, the terms of the endorsement are given their plain, ordinary meaning. *Glen Falls,*

---

[9]Because the Court **FINDS** that Erie's denial of coverage properly relies upon the "insured location" exclusion, the Court does not inquire into whether the policy's "business pursuits" exclusion applies to the instant facts.

617 S.E.2d 760 at Syl. Pt. 2; *Murray*, 509 S.E.2d 1 at Syl. Pt. 1.

The "Promise" clause of Plaintiff's endorsement provides, "**We** will pay the **ultimate net loss** which **anyone we protect** becomes legally obligated to pay as damages because of **personal injury** or **property damage** covered by this endorsement." *Pl.'s Personal Catastrophe Liability Endorsement* (Doc. 34-3), 2 (emphasis in original). According to the endorsement's introductory clauses, this promise "applies to **personal injury** or **property damage** losses occurring anywhere in the world" "during the policy period." *Id.* (emphasis in original). However, as expected, actual coverage under the endorsement is circumscribed by a lengthy set of exclusions, including a "business pursuits ... business property" exclusion. It is the applicability of the "business pursuits ... business property" exclusion that is at issue here.

Exclusion #9 of the endorsement provides that Erie does not cover "**personal injury** or **property damage** arising out of **business** pursuits or **business property** of **anyone we protect**." *Id.* at 3 (emphasis in original). In conformity with the ultracover policy, "business" is defined in the endorsement as "any activity engaged in as a trade, profession or occupation, other than farming," and "business pursuits" are not explicitly defined. "Business property,"on the other hand, a term that does not appear in the utracover policy, is used and specifically defined in the endorsement. There, "'**business property**' mean[s] property: 1. on which a **business** is conducted; 2. rented in whole or in part to others; or 3. held for such rental." *Id.* at 1 (emphasis in original). The plain terms of Exclusion #9 provide that such property is not afforded coverage under the endorsement, unless a claim falls into one of a set of exceptions. Those exceptions include, but are not limited to: (1) a claim arising out of the ownership of a one or two family dwelling within 30 days of the acquisition of such dwelling; (2) a claim for personal injury or property damage that the underlying

16

insurance provides coverage for; or (3) a claim arising out of ownership, use, loading or unloading of an automobile or watercraft. *Id.* at 3.

Upon review of Exclusion #9 and its exceptions, it is clear Plaintiff's personal catastrophe endorsement does not provide coverage for the claims against him made in the Underlying Complaint. To begin with, at the time when the Browns moved into the Carr Street Property, Harold and James Bailes had entered into an oral lease to rent the Carr Street Property to Shelly and Willard Brown, which was set to begin on January 1, 2009. As a result, when the injuries to the Brown Family and alleged wrongful death of Willard Brown occurred on or about December 25, 2008, the Carr Street Property was arguably "rented ... to others," and, at a minimum, "held for such rental." *See id.* at 1. Accordingly, this Court **FINDS** that the Carr Street Property qualified as "business property" under the endorsement and was subject to the "business pursuits ... business property" exclusion. Further, the Court **FINDS** that the exceptions to the "business pursuits ... business property" exclusion do not save Plaintiff's claim because: (1) the Carr Street Property was not acquired within 30 days of the incidents leading to the Underlying Complaint; (2) the property at issue was not an automobile or watercraft; and (3) the underlying insurance does not afford coverage for the relevant bodily injury. *See infra.* In sum, because coverage is not appropriate under Plaintiffs' personal catastrophe endorsement, the Court **GRANTS** summary judgment to Defendant on this claim.

17

**Conclusion**

For the foregoing reasons, Defendant Erie Insurance Property and Casualty Company's Motion for Summary Judgment is **GRANTED** and Plaintiff James R. Bailes' Motion for Summary Judgment is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        January 25, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE